UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

IDA M. WINTERS,

        Plaintiff,

        v.                                            Case No. 09-C-0665

MICHAEL J. ASTRUE,

        Defendant.

DECISION AND ORDER REVERSING AND REMANDING THE DECISION OF THE
COMMISSIONER AND CLOSING CASE

Plaintiff, Ida Mae Winters, filed this action seeking judicial review of the final decision of the Commissioner of the Social Security Administration denying her January 23, 2007, applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). After her applications were denied initially and upon reconsideration, Winters timely requested a hearing. She appeared at the hearing on May 28, 2008, without counsel, and Medical Expert Allen L. Hauer and Vocational Witness Robert J. Neuman testified. Administrative Law Judge Robert L. Bartelt, Jr. issued his decision on November 20, 2008, finding Winters not disabled and denying benefits. The Appeals Council denied Winters' request for review and the ALJ's decision became the final decision of the commissioner. *See Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007).

BACKGROUND

Winters, who was twenty-nine at the time of the ALJ's decision, completed high school and had past work experience as a maintenance clerk. (R. 24, 26-27.) Winters first saw Dr. Matthew Richlen on September 13, 2006, complaining of fatigue, a sore throat, back pain, arthritis, and depression. (R. 179.) She told him that she can care for her family but finds it difficult and lacks energy. Winters acknowledged symptoms such as decreased

sleep, interest, energy, and concentration. Because she had taken Prozac and Zoloft without relief, Dr. Richlen prescribed Effexor.

On September 15, 2006, Winters called Dr. Richlen complaining of blurred vision, dizziness, and malaise, as well as continued lower back pain with occasional sciatic involvement. Dr. Richlen prescribed Wellbutrin and cyclobenzaprine. (R. 213.)

On November 8, 2006, Winters advised Dr. Richlen that she was having hand and wrist pain for several days, and that in the past it had been attributed to lupus. Dr. Richlen prescribed a short course of prednisone (three daily for five days) and provided the phone number for Dr. John Albert so that Winters could follow up with him on the rheumatologic issues. (R. 174.)

Next, Winters saw Dr. Richlen on December 13, 2006, for right thumb pain. At that time, she had what seemed to be a positive Finkelstein's test and significant tenderness to palpation diffusely to the first metacarpophalangeal joint on the right hand. (R. 173, 184, 208.) Dr. Richlen advised Winters to follow up with Dr. Goodman regarding an abnormal pap smear and Dr. Paul Halverson regarding systemic lupus erythematosus. (R. 173.)

On December 29, 2006, Winters returned to Dr. Richlen complaining of headaches, which were usually one-sided, with profound sensitivity to light and blurry vision lasting a couple of hours several times a week. (R. 172, 207.) Dr. Richlen refilled her prescription for a migraine medication written previously by Dr. Tomasi and urged Winters to follow up on the lupus and get a urinalysis. However, she did not have time that day.

When Winters saw Dr. Richlen on January 18, 2007, her thumb pain was worse. Dr. Richlen noted that the first MCP on the right was slightly larger than on the left, and significantly tender to palpation on the ulnar aspect of the joint loin. He referred Winters to Dr. Chamoy because the pain had continued for several months. (R. 206.) On March 29, 2007, Dr. Richlen placed Winters in a wrist splint after diagnosing her with De Quervain's tenosynovitis. (R. 204.) Winters declined physical therapy. (*Id.*)

On April 12, 2007, Winters saw Dr. Richlen with right-sided chest pain and difficulty breathing after having been seen in the Sinai Samaritan ER the day before. (R. 202.) She was diagnosed with pneumonia and continued on Levaquin and Percocet for discomfort. (*Id.*)

Winters reported on May 3, 2007, that she was sad and admitted to decreased sleep, energy, and concentration. (R. 200.) Dr. Richlen prescribed Wellbutrin again but cautioned that Winters would need to see a psychiatrist if the Wellbutrin did not work. The thumb pain remained but she was "remarkably poor" with following up, refused physical therapy and declined an injection. (*Id.*)

Winters saw Dr. Chamoy, a hand surgeon, on June 18, 2007, who recommended a corticosteroid injection for De Quervain's and carpal tunnel in her left wrist. Additionally, he recommended splinting the sprained right thumb and injected the left first dorsal with Artistospan and Marcaine. (R. 274-275.)

Thomas Lehmann, Ph.D., evaluated Winters on July 25, 2007, at the request of the SSA. His diagnoses included major depressive disorder (recurrent, mild), medical complaints including lupus, nephritis, migraines, heart murmur, asthma, anemia, arthritis with carpal tunnel in both wrists and sciatic nerve problems, and moderate pscyhosocial stressors

3

with a severe history. (R. 232.) According to Dr. Lehman, Winters's Global Assessment of Functioning (GAF) was 65. Dr. Lehman concluded:

> The claimant appears to have a good ability to understand or to remember job instructions. She appears to have a fair ability to respond appropriately to coworkers and job supervisors. She appears to have a good ability to maintain concentration and attention of uncomplicated tasks. She appears to have a below average ability to withstand the stress or change of a routine work day. She has a number of past work experiences. Her longest job being at SBC where she was for 5-1/2 years as a maintenance administrator, desk job. She reports that she was over stressed and caught up in the lay-off in October 2006 but she does say that she was on disability leave for stress when she was laid off. She reports a number of other jobs including being a secretary for some architects, doing medical billing and accounting, working at McDonald's and Ponderosa and working in the kitchen of St. Lukes. She also did some packing in a factory and some daycare work.

(R. 232.)

On August 10, 2007, the state agency reviewing doctor, Dar Muceno, stated that Winters could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about six hours in an eight-hour workday, sit for a total of six hours, but pushing and pulling was limited in the upper extremities. (R. 235-242.) She also had limited bilateral handling (frequent) and occasional bilateral fingering. (R. 238.)

The State Agency reviewing psychologist, Keith Bauer, Ph.D., noted Winters did not have a severe mental impairment but could be assessed pursuant to 12.04 Affective disorders. (R. 249.) He felt that she had major depression, mild, and that she would have mild restriction of daily living activities, difficulties in maintaining social functions, and difficulties in maintaining concentration, persistence, or pace. (R. 252, 259.)

Winters saw Beth Johnson, MS, LPC, on September 27, 2007, for followup treatment of Bipolar 1 Disorder (most recent episode depressed). Winters was tearful but

4

oriented x3 with no evidence of perceptual problems. (R. 296-297.) She reported that she remained depressed, exhausted, and had difficultly handling the stress in her life. Winters reported a racing heart, sweating, and shortness of breath but did not report anxiety. (*Id.*)

Winters saw Johnson again on October 10, 2007, at which time Johnson revised the diagnosis of Affective Disorder to Mood Disorder Due to a General Medical Condition, with depressive features. (R. 295.) Winters's affect had improved from previous sessions, and Winters reported that her mood was better since she learned about the medical diagnosis. (*Id.*)

On October 3, 2007, Winters saw Dr. Albert, a rheumatologist, who assessed Winters for autoimmune disease. In Dr. Albert's assessment, Winters had lupus and mixed connective tissue disease. He planned to start Winters on hydroxychloroquine as a disease modifying agent, and advised her of the need for follow up visits and of the danger of noncompliance. (R. 303-304.) On October 16, 2007, Dr. Albert felt that Winters could do full time work without any restrictions (preferably sedentary). (R. 303.)

On March 24, 2008, Winters was seen on a follow up basis for problems including asthma, heart murmur, and a lump in the left armpit. She had a cystic mass in the floor of her mouth corresponding to the cystic gland for which she was referred to an ENT. (R. 321.) Also, she had anemia. (*Id.*)

On April 4, 2008, Winters advised that she had been to the emergency room for what she thought was dehydration. She was losing weight and down to 116 pounds from 125 pounds the month before. (R. 320.) The unidentified examining doctor, noted trigger points over her chest, paraspinals and knees corresponding with fibromyalgia and put her on Voltaren on April 15, 2008. (R. 319.)

5

At the hearing on May 28, 2008, Winters testified that she was born on May 9, 1979, was 5'6", and thought that her weight was 135. (R. 25.) She had three children, two two-year olds and one six-year old, who lived with her. Winters's current source of income was W2T, and she completed a high school degree. Winters did not complete any post high school education. (R. 26.)

The last time that Winters worked was January 2005, as a maintenance administrator with AT&T. She was suspended in November of 2004 when she brought a knife to work following an argument with her supervisor. Afterward, Winters was placed on disability to allow her to go to therapy and anger management. Winters returned to work for a few hours a day, but remained on disability until October of 2005. AT&T gave her a severance of approximately $5,000. (R. 28.) Winters further testified that she did not think she could get gainful employment where she would be there all of the time because of mixed connective tissue disease, fibromyalgia, migraines, carpal tunnel, chronic pain syndrome, and depression. (R. 30.)

For the connective tissues disease, Winters testified that she had taken Plaquenil off and on for six years but that it caused a cyst in her mouth and under her arm. (R. 31.) She was concerned that Plaquenil would make her go blind. (*Id.*) Winters added that she gets a headache probably once a week and that it stays for days at a time. (R. 32.) She takes Impram for the headaches as the other medications make her throw up. (*Id.*)

Winters further testified that she took Effexor, Wellbutrin, Prozac, Zoloft, and Buproprion for the depression. (R. 33.) She didn't continue because her general practitioner only gave her a 30-day limited supply and her psychiatrist wanted her to go inpatient at

6

Roger's while she was still working. (R. 33-34.) She completed a day treatment program at Roger's in 2001. (R. 34.)

With respect to her left arm, right hand and wrist, Winters testified that she received injections but they hurt each time and they do not last long. (R. 35.) She also testified that she was not treating currently. (*Id.*) And, according to Winters she took Plaquenil for the connective tissue disease, headache medication, iron twice daily, and medicine for the fibromyalgia. (R. 36.)

Winters advised that walking is problematic sometimes, and standing bothers her to the point where she must get off her feet and rest 10 to 15 minutes. (R. 36-37.) Sitting bothers Winters's back, neck and hips. (R. 37.) She no longer uses the computer but can use her hands to comb her hair, eat, and take showers. (*Id.*) Winters believes she can lift ten pounds, and sees a doctor about three times every week. (R. 38.) When she is not seeing the doctor she is usually sleeping. (*Id.*) Winters sleeps all day but not much at night. (R. 39.) She does her dishes, laundry and cleaning when she feels like it. (R. 39.) Winters has no hobbies or things that she does for fun. (*Id.*) She does not see anyone socially other than her mother and sister because she does not want to see anyone. (R. 40.)

Dr. Allen L. Hauer, a psychologist, testified as the medical expert. (R. 41.) He evaluated Winters under a listing 12.04, affect disorder. (R. 42.) Specifically, he identified adjustment disorder with mixed emotional features indicating that her mood reacts to health, as well as other life stressors, experiences, periods of dysphoria, worry, irritability, anger and frustration. (*Id.*) Dr. Allen L. Hauer felt that there were no functional limitations with respect to daily living, and mild impairments with social functioning, concentration, persistence and pace. (R. 43.)

7

Finally, the vocational expert, Dr. Robert J. Neuman, testified that past work was sedentary and semi-skilled. (R. 44.) Neuman opined based on a hypothetical that counted for the claimant's age, education and work experience, sedentary and light work that would allow for change of position while working, and during customary work breaks and tasks that would not involve constant use of the hands for fingering and handling, that there were a substantial number of jobs such a person could perform. (R. 45.) However, if the same restrictions applied but frequent use of hands was eliminated, Neuman opined that all of the jobs that would be available for the person described in the initial hypothetical would be eliminated. (*Id.*)

In his decision dated November 20, 2008, the ALJ found that Winters had not engaged in substantial gainful activity since January 17, 2005, and that Winters has the following severe impairments: connective tissue disease and left carpal tunnel syndrome. (R. 12.) The ALJ concluded that the record revealed very little mental health treatment, and that the medically determined mental impairment of depression did not cause more than minimal limitation in her ability to perform basic mental work activities. (R. 13.) In making this finding, he considered the four broad functional areas set forth in the disability regulations. Next, the ALJ further concluded that Winters does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. (R. 14.)

The ALJ reasoned that Winters had the residual functional capacity to perform the exertional requirements of light work with no more than frequent use of the hands for fingering or handling. (R. 15.) While she was unable to perform past relevant work, there were significant numbers of jobs in the national economy that she can perform. Even if the

8

jobs were limited to sedentary jobs as was the preference of the rheumatologist, there were still a significant number of jobs in the economy that Winters could perform. (R. 16.) Therefore, the ALJ found Winters not disabled.

## STANDARD OF REVIEW

This court's review of the commissioner's decision is limited and in the absence of an error of law, will uphold the commissioner's findings of fact if they are supported by substantial evidence. *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir.2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). In making a substantial evidence determination, the court will review the record as a whole, but will not reconsider the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *William v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir.1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." *Chromic v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). If reasonable minds can disagree on whether an individual is disabled, the court must affirm the Commissioner's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). However, the district court is required to review the evidence critically and not simply rubber-stamp the Commissioner's decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

## ANALYSIS

On appeal, Winters submits that the ALJ failed to fully and fairly develop the record and that new medical evidence warrants a sentence six remand. In addition, Winters argues that the ALJ failed to determine her RFC assessment properly pursuant to SSR 96-

9

8p. Finally, Winters argues that the ALJ failed to assess her credibility and/or otherwise meet his burden at step five of the sequential evaluation process.

There is no dispute that the ALJ obtained a valid waiver of Winters' statutory right to counsel. Regardless, it is well settled that the ALJ has a basic obligation to develop a full and fair record. *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir.1991) (*citing Smith v. Secretary of Health, Education and Welfare*, 587 F.2d 857, 860 (7th Cir.1978)). This duty is enhanced when a claimant appears without counsel. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009.) Pro se litigants must furnish some medical evidence to support their claim, but the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information. *Id.* (citing 20 C.F.R. §§ 416.912(d)-(f), 416.919, 416.927(c)(3)). As the examiner, the ALJ must develop the facts thoroughly. *Thompson*, 933 F.2d at 586.

Generally, courts uphold the reasoned judgment of the commissioner regarding how much evidence to gather even when the claimant lacks representation. *Id.,* at 1098. Typically, a significant omission is required before the court will find that the commissioner failed to assist pro se claimants in developing the record fully and fairly." *Id.* (citing *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir.1994)). An omission is significant only if it is prejudicial. *Id.* (citing *See Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir.1997)). Moreover, the claimant must set forth specific, relevant facts - such as medical evidence - that the ALJ did not consider. *Id.*

Winters argues that the ALJ failed to determine whether all of her medical evidence was in the record, including an RFC assessment by Dr. Richlen on May 3, 2007,

10

a Medical Examination and Capacity Form for W2 completed by Dr. Richlen on October 18, 2007, and the opinion of her psychotherapist that she would have difficulty communicating her needs, decision making, following through on agreed upon actions, with reality interpretation, and impulse control. She further asserts that her 2007 and 2008 records reveal a worsening of her physical condition, including an enlarged lymph node and emergency room visits for pneumonia, headaches, and gastritis. These records make up Exhibit A of her brief.

The record reflects that, on May 30, 2007, Winters left an "urgent message" with the Wisconsin DDS indicating that she had received a letter reporting treatment only from Dr. Richlen and that wasn't true. (R. 129.) She provided doctors' names with some phone numbers but couldn't remember the dates or types of treatment. (*Id.*) During the hearing of November 20, 2007, the ALJ advised Winters that he would admit exhibits 1A-14F unless she had a legal reason for not entering those into evidence. (R. 23.) He referred to the records as including "all of the medical records." (R. 23.) Winters stated no objections. (*Id.*)

When the ALJ referred to "all of the medical records," he had documents from her first visit to Dr. Richlen in September of 2006 through May 3, 2007. However, he had nothing from Dr. Richlen after May 3, 2007, through the date of the hearing, even though other medical records referred to Dr. Richlen and it was clear that Winters was still under his care. In addition, Winters testified at the hearing that she sees a doctor at least three times out of the week, specifically referencing her primary care physician.

One of the missing records, an October 18, 2007, Medical Examination and Capacity Form completed by Dr. Richlen and attached to Winters's brief as Exhibit A, p. 2,

11

opines that Winters would be able to occasionally and frequently lift 20 pounds, stand/walk at least two hours and sit for at least two hours per eight-hour workday, and would only be able to participate in activities/work for two hours per eight-hour day. In addition, the April 4, 2007, Medical Examination and Capacity Form completed by Winters's psychotherapist, John Gilane, noted cognitive difficulties in communicating her needs, decision making, following through on agreed actions, reality interpretation and impulse control. In addition, there is documentation of a phone call from Winters to Dr. Richlen, dated February 27, 2008, in which she stated she was dying and that her children had been caring for themselves. Hence, Winters has produced specific, relevant medical records that the ALJ would consider when evaluating her claims. Several of these records are in direct conflict with the opinions of the state agency doctors. While there is no doubt a "complete" record is always elusive and that the ALJ has no absolute requirement to update the records to the time of the hearing, *Nelms,* 553 F.3d at 1099, in this instance the court finds prejudice from the omission. The ALJ referred to the record as containing all of the medical records and knew that Winters was under the continuous care of Dr. Richlen, yet ignored a gap in records that could have changed the outcome.

Finding that this case is appropriate for remand, the court also urges the ALJ to revisit the RFC analysis. Winters asserts that the RFC is flawed in the following respects: (1) the ALJ failed to identify Winters's functional limitations or restrictions and assess her work-related abilities on a function-by-function basis as required by SSR 96-8p; (2) it is impossible to tell whose opinion the ALJ relied on in determining the RFC as required by SSR 96-8p; (3) there is no discussion of how headaches would affect Winters's ability to work or whether Winters's headaches were considered; and (4) there are no limitations

12

regarding Winters's mental impairment-depression. The RFC is the maximum that a claimant is still capable of despite her mental and physical limitations. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p).

Here, the ALJ found that Winters had an RFC to perform the exertional requirements of light work with no more than frequent use of her hands for fingering or handling and the opportunity to change her position. However, the regulations cited, 20 C.F.R. 404.1567(b) and 416.967(b), address a claimant's ability to lift and carry occasionally and frequently, but do not address how long a claimant can stand or walk. Moreover, it is difficult to determine whose opinion the ALJ relied upon in the finding that Winters could engage in no more than frequent use of her hands for fingering and handling. The state agency consultant, Dr. James Cole, found that Winters had restrictions on fine fingering but frequent gross use of the right hand. (R. 308.) Another state agency doctor, Dr. Dar Muceno, determined that Winters was to avoid frequent push/pull but could perform frequent bilateral handling, but occasional bilateral fingering. (R. 236-238.) The commissioner cites the September 10, 2007, medical record of Winters's hand surgeon, Dr. Lewis Chamoy, stating that her left hand was "pretty much asymptomatic." However, his note was made immediately after Winters received a De Quervain's injection. (R. 288.) Finally, the RFC omits any discussion of headaches, notwithstanding the medical evidence that Winters's headaches were frequent and required medication.

As a final matter, Winters alternatively requested a sentence six remand. Such a remand is warranted where the claimant has new, material evidence and good cause for failing to submit the proof at the administrative level. *Jens v. Barnhart*, 347 F.3d 209, 214 (7th Cir. 2003). "New" evidence is that which was "not in existence or available to the

13

claimant at the time of the administrative proceeding." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir.1997). With the exception of the last two records in Exhibit A, all of the supplemental records were in existence or available to Winters prior to the hearing. The last two records, dated May 29, 2008, and June 11, 2008, are dated shortly after the hearing but prior to the ALJ's decision. Thus, none of the records is "new."

Winters further asserts that a sentence six remand is warranted on the ground that she was approved for disability as of November 18, 2000, based on a re-application for benefits. However, the subsequent award of benefits without more does not serve as new, material evidence sufficient to overturn a previous denial by another ALJ. *See Allen v. Commissioner of Social Security*, 561 F.3d 646, 652-54 (6th Cir. 2009); *see also Gardner v. Astrue*, 2009 WL 2605272 *4 (C.D. Ill. 2009). Also, Winters does not suggest that her subsequent award of benefits was supported by new, material evidence that for good cause was not raised in the prior proceeding. Rather, she simply attached the first page of the notice of award to her reply brief as Exhibit A. Hence, a sentence six remand is not appropriate on this record. Now, therefore,

IT IS ORDERED that this case is reversed and remanded to the commissioner pursuant to sentence four.

IT IS FURTHER ORDERED that this case is closed.

Dated at Milwaukee, Wisconsin, this 8th day of September, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

14